RESTANI, Judge.
(“Commission”) and various of its employees. Appellant challenges his non-reappointment as a racing judge following his criticism of Commission executives’ actions in connection with penalty adjudication and his public testimony about the same. He alleges violation of his Fourteenth Amendment due process rights, his First Amendment free speech rights, and the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19-1 et seq. (West 1996).[1] We review the summary judgment record in the light most favorable to the appellant, the non-moving party. We will affirm as to the Fourteenth Amendment causes of action, but will reverse and remand for fact-finding as to the First Amendment claim and the related state law claim.

FACTS

Defendant New Jersey Racing Commission is a body created by N.J.StatAnn. § 5:5-22 (West 1996) with jurisdiction, powers and duties overseeing horse racing conducted in the State of New Jersey. Defendant Francesco Zanzuccki is the Executive Director of the New Jersey Racing Commission, and defendant Michael Vukeevich is the Deputy Director of the New Jersey Racing Commission.
In 1985, Mr. Latessa was licensed by the United States Trotting Association as an Associate Judge with powers to officiate as a judge at harness horse meets. In the latter part of 1985, he began working at various race tracks in New Jersey as either a Patrol Judge or an Associate Judge. Mr. Latessa was first appointed by the Commission as Presiding Judge at Garden State Park in 1988 and was also appointed to that position at the Meadowlands Race Track (“The Meadowlands”) in 1992.
*1316 In New Jersey, racing judges are appointed on a meet-by-meet basis. N.J.Stat.Ann. § 5:5-37(a) (West 1996). They are paid on a weekly basis and do not receive fringe benefits. See id. They serve at the pleasure of the Commission. N.J.Stat.Ann. § 5:5-37(a).
Penalty decisions are made in the first instance by certain officials employed by the Commission, including panels of judges. N.JAdmin.Code tit. 13, § 71-1.20(b)(1990). The Commission itself may modify a penalty decision. Id. § 71-1.23. Thereafter, appeal may be filed with the Commission, but the Commission may reject or modify on its own motion any imposed penalty or decision. Id. § 71-3.3 (1995). Sometime in early 1993, Mr. Zanzuccki and Mr. Vukcevich began making penalty “recommendations” in horse drugging eases prior to the formal action of the three judge panel authorized to take initial action in such matters.
In July of 1993, Mr. Zanzuccki told Mr. Latessa that a 120-day penalty should be imposed on Thomas Milici, a horse trainer accused of administering an illegal drug, by the panel of judges which included Mr. Latessa. Mr. Latessa did not demur, but rather advised the panel of Mr. Zanzuceki’s statement. The other judges disagreed, believing that the penalty would be inconsistent with penalties imposed in like circumstances previously and imposed a 90-day sentence. Mr. Latessa did not register a contrary vote.
Mr. Zanzuccki was not pleased with the outcome of the Milici matter and demanded reports from the three judges as to what had occurred. The other two judges did not discuss what had occurred procedurally, but reported on the substance of their reasoning. Mr. Latessa described similar reasoning, but also indicated that while he had advocated Mr. Zanzuccki’s preferred penalty, he had been outvoted. Follow-up questioning of the other judges indicated to Mr. Zanzuccki that Mr. Latessa’s “advocacy” did not go beyond reporting Mr. Zanzuccki’s statement and that Mr. Latessa registered no formal dissenting vote.
During the summer of 1993, Mr. Zanzuccki continued to either recommend or direct drug violation penalties prior to the completion of proceedings before the panel of racing judges. It was in connection with one of these cases that Mr. Latessa later gave testimony before the Office of Administrative Law about the early intervention of Mr. Zanzuccki in the proceedings.
At the end of the summer Mr. Latessa was reappointed as the Presiding Judge for the upcoming harness racing meet at Garden State Park. During the early fall Mr. Latessa, Mr. Vukcevich, and Mr. Zanzuccki continued to disagree about the manner in which the Milici matter was handled. In the first week of November, during a racing meet in California, Santo Lalomia, Chairman of the New Jersey Racing Commission, interviewed Michael Corley for the position of Presiding Judge. On November 16, 1993, Mr. Zanzuccki requested a meeting with Mr. Latessa scheduled for November 30, 1993. On November 19, 1993, Mr. Vukcevich sent Mr. Latessa a memorandum noting the “inconsistent” accounts of the Milici deliberations, as well as other points of disagreement. On November 22, 1993, Mr. Latessa testified before the Office of Administrative Law and one day later Mr. Zanzuccki sent a memorandum to Mr. Lalomia indicating he had decided not to reappoint Mr. Latessa. The Administrative Law Judge credited Mr. Latessa’s testimony and issued an opinion on November 29, 1993, critical of the actions of Mr. Zanzuccki and his deputy. The administrative law judge said in part:
The impartiality of the agency head — the NJRC — will be compromised if the Executive Director and/or Deputy Director participate in any advisory capacity concerning the penalty issue. The Executive Director and Deputy Director have already instructed the judges to impose a two-year suspension. The Deputy Director and Executive Director have in the past discussed penalty with the NJRC after an ALJ issued a decision, thereby making the proceedings before the OAL seem rather superfluous. “The primary reason for establishing the [OAL] was ‘to bring impartiality and objectivity to agency hearings and ultimately to achieve higher levels of fairness in administrative adjudications.’ ” In re Uniform Administrative Procedure Rules, 90 N.J. 85, 90 [447 A.2d 151] (1982) (citation omitted); *1317 While an administrative agency has the ultimate authority to adopt, reject or modify an ALJ’s recommended findings of fact and conclusions of law, “the agency head must base the final decision solely on the record established at the hearing.” Matter of Opinion No. 583, supra, 107 N.J. [230] at 238 [526 A.2d 692 (1987)]. Thus, if the NJRC considers “other” information from the Executive Director and Deputy Director, the very individuals who proposed the penalty in this case, then the NJRC, as the final authority, would be admitting new evidence that neither the opposing party nor this ALJ had the opportunity to consider. Such actions, if permitted, would undermine the very purpose of the OAL proceeding. On a lesser scale of importance, but significant, and equally troubling, is the apparent blending of functions that seems to be common practice at the NJRC. Presiding Judge Latessa plainly acknowledged that he did not feel that the judges could do anything but follow the penalty proposed. From his testimony, a licensee, like Rubin, must question how impartial is such a hearing and, even assuming that there is nothing wrong with this practice, which seems to be at odds with basic due process notions, there is an [sic] least an appearance of impropriety. Such practices place individuals of high integrity, like Latessa and Gallagher, who essentially serve at the pleasure of the NJRC, in a difficult and possibly a compromising position. The potential for abuse is present and carried to its logical extreme, could result in the dismissal of a conscientious judge or steward.
App. at 195-96 (emphasis in original).
On December 3, 1993, Mr. Corley was recommended as the replacement for Mr. Latessa at the 1994 Meadowlands Harness Race Meeting.
Discussion
I
Pursuant to 28 U.S.C. § 1291 we have jurisdiction to decide this appeal from a final decision of the district court. The district court had jurisdiction under 28 U.S.C. § 1331 as plaintiff brought claims under 42 U.S.C. §§ 1981, 1983, 1985 and 1988.[2]
As this matter comes to us following a grant of summary judgment under Fed. R.Civ.P. 56 in favor of defendants on all claims, review is plenary. Jefferson Bank v. Progressive Cos. Ins. Co., 965 F.2d 1274, 1278 (3d Cir.1992). We also address whether the district court abused its discretion in denying leave to amend the complaint under Fed.R.Civ.P.15 (a) to add new state law claims. Douglas v. Owens, 50 F.3d 1226, 1235 (3d Cir.1995).
Mr. Latessa alleges three causes of action under 42 U.S.C. § 1983 based on deprivation of federal constitutional rights. First, he alleges violation of his Fourteenth Amendment due process rights stemming from his liberty interest in remaining free to work as a racing judge. Second, he alleges violation of his Fourteenth Amendment due process rights stemming from his property interest in his position as Presiding Judge for the New Jersey Racing Commission. Third, he alleges violation of his free speech rights under the First Amendment. We will address these issues in the order set forth.
II
Mr. Latessa alleges violation of his Fourteenth Amendment due process rights *1318 stemming from his liberty interest in remaining free to work as a racing judge. The liberty interest at issue is the right to “pursue a calling or occupation, and not the right to a specific job.” Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1259 (3d Cir.1994) (quoting Wroblewski v. City of Washburn, 965 F.2d 452, 455 (7th Cir.1992)).
We affirm the district court’s grant of summary judgment against Mr. Latessa as “there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Mr. Latessa failed to present any support for his contention that due to his non-reappointment he was effectively banned from all work in his occupation as a racing judge. In response to the motion for summary judgment he offered neither affidavits nor evidence of unsuccessful attempts to secure such employment following the non-reappointment at The Meadowlands.[3] Mr. Latessa worked at tracks other than The Meadowlands and he did not attempt to establish that employment at other venues was not reasonably available to him. Moreover, Mr. Latessa offers no support for the proposition that he was unreasonably restricted in his ability to pursue his chosen occupation. Thus, the district court appropriately granted defendants’ summary judgment on Mr. Latessa’s claim of deprivation of a liberty interest without due process of law in violation of the Fourteenth Amendment.
Ill
In order to succeed on a claim of deprivation of due process under the Fourteenth Amendment with respect to termination of a specific employment position, a plaintiff must first establish a property interest in the employment. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 576, 92 S.Ct. 2701, 2708-09, 33 L.Ed.2d 548 (1972). To have a property interest in a job or job benefit, an employee must have a legitimate claim of entitlement, not just a unilateral expectation. Id. at 577, 92 S.Ct. at 2709. Mr. Latessa lacked a legitimate claim of entitlement to his position. The parties do not dispute that New Jersey racing judges are appointed on a meet-by-meet basis, paid on a weekly basis, and receive no fringe benefits. Moreover, they serve at the pleasure of the New Jersey Racing Commission. See N.J.Stat.Ann. § 5:5-37(a). Thus, if only the statute were at issue, we would conclude that Mr. Latessa was an at-will employee without a property interest in his employment as a racing judge.[4]
Property interests in employment may also arise, however, from “‘mutually explicit understandings’ between a government employer and employee.” Stana v. School Dist. of City of Pittsburgh, 775 F.2d 122, 126 (3d Cir.1985). Mr. Latessa asserts there is a triable issue of fact as to the existence of a property interest based on such understandings. He points to the deposition of Santo Lalomia, a defendant and Chairman of the New Jersey Racing Commission in support. In his deposition, Mr. Lalomia indicated that there was little turnover in the racing judge appointments, and “generally speaking” if one “keeps his nose clean” and lives up to expectations, employment would continue. This generalized statement is insufficient to create a position requiring just cause as a prerequisite for involuntary termination.
Mr. Latessa suggests the mutual understanding described by Mr. Lalomia’s deposition testimony is similar to the understanding documented in Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699-2700, 33 L.Ed.2d 570 (1972).[5] Perry, however, is dis *1319 tinguishable. In that case, plaintiff alleged a de facto tenure program for college professors “secured by ‘existing rules or understandings.’ ” Id. (citing Roth, 408 U.S. at 577, 92 S.Ct. at 2709). The plaintiff alleged that the mutual understanding of continued employment was documented in the employer’s official faculty guide which stated a faculty member “has permanent tenure as long as his teaching services are satisfactory ....” Id. at 600, 92 S.Ct. at 2699. Moreover, plaintiff relied upon Guidelines promulgated by the Coordinating Board of the Texas College and University System which stated if employed for seven years, the employee has some form of job tenure. Id. Mr. Latessa, however, has pointed to no evidence of such rules or understandings as to racing judges. The very generalized testimony cited does not reflect a specific bilateral understanding that particular cause must be shown before non-reappointment may occur. Thus, the district court correctly granted summary judgment to defendants on the basis of no triable issues of fact as to the existence of a property interest in plaintiff’s position as racing judge.
IV
Unlike Fourteenth Amendment due process rights, appellant’s First Amendment right to be free from retaliation for speech is not defeated by the lack of a property or liberty interest in his employment. Id. at 599, 92 S.Ct. at 2698-99. A public employee’s claim of retaliation for a protected activity, here speech, is analyzed in three steps. Green v. Philadelphia Hous. Auth., 105 F.3d 882, 885 (3d Cir.1997); Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir.1996); Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir.1995). First, the plaintiff must demonstrate that his speech was protected. Green, 105 F.3d at 885. Second, the plaintiff must show that the speech was a motivating factor in the alleged retaliatory action. Id. Third, the defendants may defeat the plaintiffs claim by establishing that the adverse action would have been taken even in the absence of the protected speech. Id.
The district court focused on Mr. Latessa’s testimony of November 22, 1993 before the New Jersey Office of Administrative Law which indicated that Mr. Latessa did not feel free to disagree with the penalty recommendations of Mr. Zanzuceki. The court determined that the decision not to reappoint Mr. Latessa occurred prior to November 22, 1993, and thus the testimony could not have been a motivating factor in the alleged retaliatory non-reappointment.
In denying defendants’ prior motion to dismiss, the district court had found that Mr. Latessa raised issues potentially satisfying the first prong of the test. For speech by a government employee to be protected, it must be regarding a public concern, as opposed to employment matters unrelated to such concerns. See Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983); Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir.1997). Furthermore, we held in Green that a public employee’s truthful testimony before a government adjudicating or fact-finding body, whether pursuant to a subpoena or not,is a matter of public interest. 105 F.3d at 887. Thus, Mr. Latessa’s testimony before the Office of Administrative Law is a matter of public concern.
A balancing test exists to determine if such public concern speech by a government employee is protected. See Pickering v. Board of Educ. of Township High Sch. Dist. 205, Will County, Illinois, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968). The public interest favoring expression “must not be outweighed by any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees.” Watters, 55 F.3d at 892. Under the test, the government must show that the public concern value of the speech was likely to be outweighed by the disruption. Id. at 896 (applying new test of Waters v. Churchill, 511 U.S. 661, 673, 114 S.Ct. 1878, 1886-87, 128 L.Ed.2d 686 (1994)).
Appellees’ position is that Mr. Latessa was fired for “lying” in conversation and memoranda between Mr. Latessa and Mr. Zanzuceki, not because Mr. Latessa’s testi *1320 mony critical of administrative procedures was likely to be disruptive. Thus, for purposes of this appeal, the public concern speech represented by the testimony is treated as protected speech and the issue of whether Mr. Latessa was not reappointed in retaliation for his testimony must be addressed. For the following reasons we find this issue cannot be resolved as a matter of law.
First, although Mr. Latessa had previously complained internally about what he believed was Mr. Vukcevich’s and Mr. Zanzuccki’s unlawful interference in the initial stages of the penalty proceedings, his public testimony occurred one day before Mr. Zanzuccki’s memorandum indicating Mr. Latessa would not be recommended for reappointment. Second, even though Mr. Latessa’s eventual replacement, Mr. Corley, was interviewed before the testimony, there is no indication that a decision to appoint him had been made before the testimony.[6]
Moreover, a fact-finder reasonably might view the accusation of “lying” as mere pretext. See Waters v. Churchill, 511 U.S. at 677, 114 S.Ct. at 1888-89 (employer may not rely on unreasonable conclusion as to what was said as pretext for firing because of protected speech). Here, the “lie” was Mr. Latessa’s statement representing his presentation of Mr. Zanzuccki’s “recommendation” to the panel of judges in the Milici matter as “advocacy.” The “lie” may also have included his characterization of his action in the Miliei matter as either a vote, a lack of a vote or the Commission’s vote. While a trier of fact might conclude Mr. Latessa was fired because he was reasonably perceived to be lying, based on the evidence a trier of fact might also conclude otherwise. Given the fluidity of the panel deliberations,there may have been no “lie” in the sense of a knowingly false statement, and a trier of fact might conclude that Mr. Zanzuceki perceived just that and fired Mr. Latessa for the protected speech before the Office of Administrative Law. In view of the content of Mr. Latessa’s speech, its temporal relation to the first indication in the record of a decision not to reappoint, and because a fact finder might reasonably reject as pretext the “lie” explanation for non-reappointment, a fact finder might also reasonably conclude that the testimony was the final straw, and hence a motivating factor for the failure to reappoint.
In summary, as we view the current record, Mr. Latessa has marshaled substantial evidence tending to support the proposition that his testimony, rather than any lack of personal integrity in connection with the Milici matter, caused his non-renewal. First, Mr. Latessa had served for many years as a judge without challenge to his integrity. Second, Mr. Latessa’s letters of July 13 and July 21, which are said by appellee to have demonstrated Mr. Latessa’s lack of personal integrity in the Milici matter, are at best ambiguous and could be found by a reasonable trier of fact to be entirely consistent with his being qualified to serve as a judge. Third, Mr. Latessa was reappointed as the Presiding Judge for the fall meet on August 23, 1993, more than a month after he is said to have demonstrated this lack of personal integrity. Fourth, prior to his testimony before the Administrative Law Judge on November 22, 1993, there is no documentation of a decision having been made by anyone not to renew Mr. Latessa. Fifth, Mr. Latessa’s testimony before the Administrative Law Judge could be regarded by a trier of fact as very embarrassing to Zanzuceki, Vukcevich and the Commission. And, finally, on November 23, 1993, the day after this potentially embarrassing testimony was given, Zanzuccki wrote a letter to the Chairman of the Commission advising him that he intended to notify Latessa on November 30 that he would not be renewed. This letter is significant not only because it is the first documentation of a decision by anyone not to renew, but also because it reveals that Zanzuceki was then lobbying for the support of the Chairman and did not regard the non-renewal decision to be a fait accompli.
Accordingly, we will remand to the district court because the second prong of the three- *1321 step analysis requires a factual determination as to whether Mr. Latessa’s November 22, 1993 testimony was a motivating factor in the decision not to reappoint him as a Presiding Judge.
Furthermore, the district court appears to have ruled alternatively that even if the protected conduct was a motivating factor in Latessa’s reappointment, for independent reasons he would not have been reappointed. See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977). If viewed in the light most favorable .to plaintiff, the facts discussed previously do not permit summary judgment for defendant on this ground.
V
It is unclear from the presentation of this case as to whether Mr. Latessa alleges his “vote” in the Milici matter was protected speech and was part of the motivation for the non-reappointment. Mr. Latessa does allege that his right to vote freely in other eases was chilled by Mr. Zanzuceki’s actions following the Milici matter. Numerous employment actions directed by an employer involve the medium of speech. All such actions do not become protected simply because some expression is involved. See Connick v. Myers, 461 U.S. 138, 143, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (“Government offices could not function if every employment decision became a constitutional matter.”). While Mr. Latessa’s public statements about the procedures affecting voting may be of public concern and hence protectable, his generalized allegation that he could not vote as he wished does not support a claim based on the First Amendment. The vote in any particular case was not improper compelled expression on a political or ideological matter. See, e.g., West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943)(compulsion to salute flag and recite the pledge of allegiance invalid as “no official ... can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein”). Nor was any particular penalty vote otherwise relevant to a self-governing society’s ability to self-govern. See Azzaro, 110 F.3d at 977-78. Mr. Latessa’s complaints involved the procedure employed and it is his expression about such procedure that is of public concern.
Of more substance is Mr. Latessa’s argument that he was discharged because of his on going internal objections to Mr. Zanzuccki’s and Mr. Vukcevich’s interference in initial penalty decision-making. Internal expression may also be protected. Id. (“Private dissemination of information and ideas can be as important to effective self-governance as public speeches.”). Such claims must be analyzed under Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In that ease an assistant district attorney who was protesting transfer circulated an office questionnaire relating to internal office matters not of public concern and also relating tangentially to a matter of public concern, specifically, pressure to work in political campaigns. The question once more is to what degree the internal speech touches upon matters of public concern and to what degree effective functioning of the governmental office is likely to be disrupted by the speech. See id. at 150, 103 S.Ct. at 1692. The Commission’s burden in justifying its action “varies depending on the nature of the employee’s expression.” See id. For the following reasons, we remand this issue to the district court to apply the three step procedure set forth in Pickering and Connick, as modified by Waters.
First, appellees have not asserted directly any likely disruption to governmental functions as they continue to allege only that Mr. Latessa was fired for lying. See Connick, 461 U.S. at 150, 103 S.Ct. at 1691-92. Second, the balance in the internal complaints between nonpublic and public concerns is unclear. Mr. Vukcevich’s memorandum of November 19, 1993, does reveal that Mr. Latessa was understood to be complaining about the intervention in initial penalty decision-making, as well as other matters of both public and personal concern. Third, the district court did not address whether the public concern portion of this internal speech, rather than the testimony only, was a motivating factor in the non-reappointment. Finally, al *1322 though the district court concluded that early Commission intervention was not illegal, the New Jersey law is ambiguous. One could reasonably argue, as the administrative law judge noted upon hearing Mr. Latessa’s testimony, that if the Commission decides from the outset what penalties should be imposed there is no point to a multi-layered adjudicatory system. In any case, the wisdom of the early intervention is a matter of public concern, even if it is not prohibited under current New Jersey law. Because Mr. Latessa’s internal complaints about administrative procedures touch upon matters of public concern, the issue of retaliatory action for internal speech must be remanded.
Mr. Latessa’s state law claim was also dismissed because he did not establish that protected speech was a motivating factor in his nonreappointment. Thus, this claim will also be remanded. Because denial of plaintiffs motion to amend to add other state law claims apparently was based on the district court’s dismissal of all federal claims, this issue will be remanded, as well.[7]

. To the extent Latessa pursues a common law wrongful discharge claim on appeal, Latessa may not pursue that claim on remand because he failed to raise it before the district court in the first instance.

. The district court’s dismissal of appellants’ claim under 42 U.S.C. § 1985(2) is not the subject of the appeal. The district court indicated that no claim existed under 42 U.S.C. § 1981 and plaintiff presented no arguments on appeal indicating he has such a claim. Thus, we affirm dismissal of the action as to that section. The district court also indicated that the parties were in agreement that the Eleventh Amendment requires dismissal of the federal causes of action against the state agency defendant. While claims based on statutes implementing the Fourteenth Amendment are not barred by the Eleventh Amendment if the intent to abrogate state immunities is clear, see Seminole Tribe of Florida v. Florida, — U.S. -, -n. 15, 116 S.Ct. 1114, 1131 n. 15, 134 L.Ed.2d 252 (1996), here, the parties agreed that the Commission is a state agency and not a "person" for purposes of 42 U.S.C. § 1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). Waiver of immunity for the state law claims was not addressed.

. Following the non-reappointment, he did work as a racing judge in Maryland for a short time, but he found it unacceptable for geographical reasons.

. We assume for the sake of argument that the legislature has not barred the Commission from granting employment rights of the type claimed here.

.The Supreme Court in Perry did not hold that the plaintiff had a legitimate claim of entitlement to job tenure. Id. at 602, 92 S.Ct. at 2700. Instead, it found that the plaintiff had alleged the existence of rules and understandings that "may justify his legitimate claim of entitlement to continued employment absent 'sufficient cause’ "and remanded to the district court to make such a determination. Id. at 602-03, 92 S.Ct. at 2700.

. The prior scheduling of a meeting between Mr. Zanzuceki and Mr. Latessa for November 30, 1993 is not determinative, because the record does not reveal what the purpose of the meeting was at the time of scheduling.

. The district court did not state its reason expressly.