John SHEHEE, Plaintiff,

v.

CITY OF WILMINGTON, a political subdivision of the State of Delaware; Gregory Williams, individually and in his official capacity; and Claude McCrea, individually and in his official capacity, Defendants.

Civil Action No. 00–918–SLR.

United States District Court,
D. Delaware.

May 29, 2002.

Victor P. Battaglia, Esquire and Philip B. Bartoshesky, Esquire of Biggs & Battaglia, Wilmington, DE. Counsel for Plaintiff.

Rosamaria Tassone, Esquire and Aaron R. Goldstein, Esquire, City of Wilmington Law Department, Wilmington, DE. Counsel for Defendant City of Wilmington.

Thomas S. Neuberger, Esquire, Wilmington, DE. Counsel for Defendant Gregory Williams.

William J. Rhodunda. Jr., Esquire of Oberly, Jennings & Rhodunda, P.A., Wilmington, DE. Counsel for Defendant Claude McCrea.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

### I. INTRODUCTION

On October 26, 2000, plaintiff John Shehee filed this action against defendants City of Wilmington, former Director of the City Department of Parks and Recreation Gregory Williams, and Superintendent of Parks and Recreation Claude McCrea, claiming First Amendment and civil rights violations and common law torts stemming from alleged employment retaliation after plaintiff gave deposition testimony in a lawsuit involving former Mayor Sills. (D.I.1) The court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343. Currently before the court are defendants' motions for summary judgment. (D.I.105, 111, 119) For the following reasons, the court shall grant defendants' motions.

### II. BACKGROUND

Plaintiff was hired by the City of Wilmington Department of Parks and Recreation (the "DPR") on February 6, 1973. (D.I. 107 at 270) During the early 1990s, plaintiff held the position of Superintendent of Parks and Recreation. (D.I. 113 at A154) During that time, Mr. McCrea was supervised by plaintiff. (D.I. 107 at A37) In January 1993, the Administration of Mayor James H. Sills took office. The following month, Mr. Williams was appointed Deputy Director of Parks and Recreation. (D.I. 107 at A87–88) On July 1, 1995, plaintiff's position was eliminated, and he exercised his right under the City Personnel Code to take a new position as Executive Director of the William Hicks Anderson Center (the "Anderson Center"), a facility operated under the DPR. (D.I. 113 at A49–50) On July 24, 1995, Mr. Williams became the acting Director of the DPR, and in November 1995, was officially appointed as Director. (D.I. 107 at A357) On November 1, 1995, Mr. Williams informed plaintiff that he had successfully completed his probationary period as Executive Director of the Anderson Center.[1] (D.I. 113 at A52)

In early 1999, the position of Superintendent of Parks and Recreation was resurrected, but plaintiff did not apply for the position. Mr. McCrea was appointed as the new Superintendent. (*Id.* at A189–90) After Mr. McCrea assumed the position, Mr. Williams instituted a new organizational structure that placed plaintiff, as Executive Director of the Anderson Center, under the authority of Mr. McCrea. (D.I. 107 at A36)

In June 1999, plaintiff was deposed in the matter of *Michael A. Brown, Sr. v. Sills, et al.*, Civil Action No. 99–680–RRM, pursuant to a subpoena.[2] The plaintiff in that action, a DPR employee, filed suit against the City, Mayor Sills and Mr. Williams, alleging, *inter alia,* that he was wrongfully terminated for making comments about Mr. Williams on a local television program. At the deposition, plaintiff testified that Mr. Brown appeared to be a good employee, that he never had any problems with Mr. Brown, that Mr. Brown was respectful of his authority as Execu-

---

**1.** Evaluations of plaintiff during his tenure at the Anderson Center reflect that he performed his work satisfactorily, although Mr. Williams noted as early as 1996 that plaintiff was negligent in submitting required monthly reports and notifying his supervisors of absences from work. (D.I. 113 at A33–42, A51, A54; D.I. 107 at A23) During the course of plaintiff's time at the Anderson Center, Mr. Williams also gradually lessened plaintiff's duty to approve usage of the Anderson Center by outside agencies and submission of employee timesheets. (D.I. 113 at A35, A51)

**2.** The parties disagree as to whether Mr. Williams and Mr. McCrea knew of plaintiff's deposition testimony prior to the commencement of this litigation. (D.I. 107 at A100, A210; D.I. 129 at B118, B206)

tive Director of the Anderson Center, that he never observed Mr. Brown being disruptive in the workplace, and that he had never heard of any complaints about Mr. Brown being disruptive in the workplace. Plaintiff also testified about a conversation he had with Mr. Brown during which Mr. Brown expressed his intention to record any conversations he had with his superiors about "repercussions" from his television appearance. (D.I. 107 at A229–56) The litigation resulted in a settlement, and Mr. Brown was reinstated to his position. (*Id.* at A105–06)

Beginning on September 29, 1999, plaintiff took a medical leave of absence from work. (D.I. 113 at A55–57) Medical records reflect that on November 2, 1999, plaintiff began receiving regular treatment from psychiatrist Joseph Bryer, M.D. for depression. (D.I. 129 at B5; D.I. 113 at A56–57) Dr. Bryer noted that plaintiff had been having "depressive symptoms over the past year or two in the setting of significant work stress."[3] (D.I. 113 at A56) Plaintiff was also receiving chiropractic and physiotherapy treatment for chronic headaches, cervicalgia and low back pain "as a result of the repetitive physical and mental stress that he was undergoing at work."[4] (D.I. 129 at B6) On November 10, 1999, plaintiff visited the City's Medical Dispensary and indicated to the City's physician that he suffered from depression. (*Id.* at B27–28)

Because of recurrent internal thefts and excessive alarm trips during plaintiff's absence, Mr. McCrea changed several of the locks at the Anderson Center over a period of months. (D.I. 107 at A23, A125–26) Mr. McCrea also occupied plaintiff's office during his absence, and placed plaintiff's belongings in a storage room as a result. (*Id.* at A23, A123–24)

On April 12, 2000, plaintiff's attorney contacted the City and requested that the City compensate plaintiff under the Worker's Compensation Act for his mental stress injury. (D.I. 113 at A70) On April 24, 2000, plaintiff returned to work three days per week in accordance with doctor recommendations, but took a medical leave of absence again on May 10, 2000. (*Id.* at A69) Later that month, the City's investigator, John Manning, began an inquiry concerning plaintiff's claim. Mr. Manning interviewed plaintiff, Mr. Williams, and two other DPR employees—Jana Lane Brown and Romain Alexander. Both Ms. Brown and Mr. Alexander corroborated plaintiff's account of his hostile relationship with Mr. Williams, but Mr. Williams denied the allegations.[5] (D.I. 129 at B8–19) Mr. Manning concluded:

> John Shehee felt that Greg Williams with the willing assistance of Claude McCrea was trying to build a case against him to have him fired. Shehee claims that the actions of Greg Williams

---

**3.** Dr. Bryer remarked that plaintiff "believes that the problems began when Mayor [Sills] took office.... He was also pressured into giving certain testimony in a deposition which was favorable to the mayor's administration. However, he states that he told the truth and ever since then the pressure on him to leave has been more intense." (D.I. 113 at A56) Another psychologist's report indicated that plaintiff felt harassed, embarrassed, humiliated, and set up to be fired for the "last 8 years." (D.I. 107 at A356.1)

**4.** Plaintiff's medical records reflect a history of health problems, including back pain as early as 1996, a family history of headaches and migraines, and spinal problems. (D.I. 107 at A63, A325, A340) There is also evidence of personal problems affecting plaintiff's mental health, including deaths and illnesses of family members. (D.I. 107 at A350–67; D.I. 113 at A97)

**5.** In an affidavit in support of this litigation, plaintiff claimed that
> from approximately 1995 Mr. Williams has irrationally sought to destroy his effective-

has caused the physical and mental problems that ... Shehee is now experiencing. Shehee thinks that Greg Williams started his campaign against him because Shehee was friendly with the former City Administration of Dan Frawley and that Shehee was a personal friend of the former Parks & Recreation Commissioner Don Bowman. Shehee also mentioned his testimony in the Michael Brown vs. the City of Wilmington Trial which was favorable to Michael Brown. Shehee [bases] this assumption on comments and statements Greg Williams had made to him and other workers in Parks & Recreation.

. . . .

From talking to Shehee, Jana Lane–Brown and Romain Alexander I did not see enough facts to state with certainty Shehee's description of his working environment was accurate.

(D.I. 113 at A91–92)

A City Committee met in late May to consider plaintiff's claims. On June 5, 2000, the City agreed to compensate plaintiff's psychological claim under the Worker's Compensation Act of the State of Delaware, and reinstated all of the sick and vacation days used by plaintiff for his leave of absence, in addition to providing plaintiff with supplemental payments under the City's own worker's compensation policy.[6] (D.I. 107 at A309; D.I. 113 at A75) The City denied as non-compensable plaintiff's claim for physical injuries related to the stress. (D.I. 129 at B38) On August 11, 2000, the Agreement as to Compensation was approved, which provided plaintiff with temporary total disability payments for October 4, 1999 through April 23, 2000, and for partial disability payments for April 24, 2000 through May 10, 2000.[7] (D.I. 113 at A78–81)

Dr. Bryer permitted plaintiff to return to work on July 23, 2001 on the condition that he would not be placed at the Anderson Center.[8] (Id. at A98) Plaintiff returned to work on August 6, 2001 as Youth Service Coordinator. (Id. at A100)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers

---

ness as a City employee by engaging in a series of irrational, arbitrary, and vindictive acts.
(D.I. 129 at B35) Plaintiff further stated that after he testified in the Brown v. Sills litigation, [Mr. Williams'] behavior became increasingly irrational and paranoid, including demands to be informed whenever Mr. Brown entered the Williams Hicks–Anderson Center or spoke with him.
(D.I. 129 at B36) Further, Mr. Williams' conduct was "unreasonable and included sending employees to spy on [him]." (Id. at B36) The record contains testimony from several City employees corroborating plaintiff's allegations, e.g., that Mr. McCrea was recruited by Mr. Williams "to help get rid of" plaintiff, that Mr. Williams and Mr. McCrea wanted to get "new blood" into the department, and that Mr. Williams' behavior "started to worsen" after the Brown v. Sills deposition because plaintiff "wasn't being loyal." (Id. at B20, B76, B118, B164–67, B185–87, B216–23, B243, B269–74) The employees also testified that Mr. Williams exhibited abusive, erratic and hostile behavior toward many DPR employees during his tenure. (Id. at B1–B4, B8, B20–22, B82–88)

6. Consequently, the City's Risk Management Analyst filed a First Report of Injury with the State Industrial Board. The Report cited plaintiff's injury as "stress, anxiety" as a result of "conflict with supervisor," and stated the date of injury as September 29, 1999 and the date on which the City "knew of the injury" as November 10, 1999. (D.I. 113 at A77)

7. Plaintiff's attendance records reflect that he worked intermittently during his period of medical leave. (D.I. 107 at A303–07)

8. Dr. Bryer allowed plaintiff to return to work provided that he "return to a job site other than his usual site, due to conflicts and stress-

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. DISCUSSION

### A. Liability of Defendant City of Wilmington

 The City, as a municipality, is not liable through respondeat superior for the constitutional torts of its employees. *See Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1295 (3d Cir.1997). "Municipal liability attaches only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury' complained of." *Id.* (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). As the court finds no evidence to suggest that any adverse action taken against plaintiff was the result of an official or unofficial government policy, the City of Wilmington cannot be held liable under 42 U.S.C. §§ 1983, 1985 and 1986. *See id.; Simril v. Township of Warwick,* No. 00–5668, 2001 WL 910947, at *2 n. 5 (E.D.Pa. Aug.10, 2001) (stating that the Third Circuit's analysis of municipal liability and respondeat superior under § 1983 applies equally to claims under §§ 1985 and 1986).

### B. Section 1983 Claim for First Amendment Retaliation

 A public employee's retaliation claim for engaging in protected speech

---

es at his original site" and that plaintiff's "work hours be restricted to half time for the first two weeks." (D.I. 129 at B33) Dr. Bryer noted that "[s]everal issues about the return, such as lack of office space and of a telephone, were distressing to [plaintiff] and he noted an increase in residual depressive symptoms such as poor sleep and increased anxiety." (*Id.* at B5) The City's physician agreed that plaintiff could return to work on that date, but noted that his chiropractic treatment did not appear to be necessary. (D.I. 113 at A99)

must be evaluated under a three-step process. *See Green v. Phila. Hous. Auth.*, 105 F.3d 882, 885 (3d Cir.1997); *Pro v. Donatucci*, 81 F.3d 1283, 1288 (3d Cir. 1996). First, a plaintiff must establish that the speech in question was protected. *See Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir.1993). For this purpose, the speech must involve a matter of public concern. *See Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If the speech is of public concern, a plaintiff must demonstrate that his interest as a citizen in commenting on matters of public concern outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). These determinations are questions of law for the court. *See Azzaro v. County of Allegheny*, 110 F.3d 968, 975 (3d Cir.1997).

 If the court finds that the speech is protected, a plaintiff must show that the speech was a substantial or motivating factor in the alleged retaliatory action taken by the employer. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Finally, the public employer can rebut the claim by demonstrating "by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct." *Id.* The second and third stages of this analysis are questions of fact. *See Green*, 105 F.3d at 889.

## 1. Protected Speech

### a. Matter of Public Concern

 An employee's speech addresses public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. A court must consider the content, form and context of the speech when making this determination. *See id.*

In *Pro v. Donatucci*, the Third Circuit held that a public employee's court appearance in response to a subpoena is a matter of public concern, regardless of the content of the expression. *See* 81 F.3d at 1291. The Third Circuit expanded this holding in *Green v. Phila. Hous. Auth.*, in which it found that a public employee's voluntary appearance in court is also a matter of public concern regardless of the content of the expression. *See* 105 F.3d at 887. The Court explained:

"When an employee testifies before an official government adjudicatory or fact-finding body he speaks in a context that is inherently of public concern. Our judicial system is designed to resolve disputes, to right wrongs. We encourage uninhibited testimony, under penalty of perjury, in an attempt to arrive at the truth. We would compromise the integrity of the judicial process if we tolerated state retaliation for testimony that is damaging to the state."

. . .

The utility of uninhibited testimony and the integrity of the judicial process would be damaged if we were to permit unchecked retaliation for appearance and truthful testimony at such proceedings. Not only would "the first amendment right of the witness be infringed by this type of coercion, the judicial interest in attempting to resolve disputes would be in jeopardy. Furthermore, a witness who succumbed to any real or imagined coercion could also be subject to a charge of perjury."

*Id.* (quoting *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir.1989); *Reeves v. Claiborne County Bd. of Educ.*, 828 F.2d 1096, 1100 (5th Cir.1987)).

In the case at bar, plaintiff gave deposition testimony, pursuant to a subpoena, in an unlawful termination action brought by a former fellow public employee. Similar to testimony in courtroom proceedings, plaintiff's testimony was given under oath and presumably relied upon by the parties and the court in an attempt to resolve the dispute. Plaintiff's deposition testimony implicated the same interests that led the Third Circuit to conclude that courtroom testimony, given voluntarily or pursuant to a subpoena, is a matter of public concern. Thus, consistent with the reasoning of the Third Circuit, the court concludes that plaintiff's deposition testimony is also a matter of public concern. *See, e.g., McCullough v. City of Atlantic City,* 137 F.Supp.2d 557, 568 n. 3 (D.N.J.2001).

### b. Balance of Interests

The court also finds that the public interest favoring plaintiff's deposition testimony is not "outweighed by any injury the speech could cause to the interest of the [City] as an employer in promoting the efficiency of the public services it performs through its employees." *Green,* 105 F.3d at 885. Of particular importance is the public interest favoring subpoenaed testimony. "It implicates not only the integrity of the truth seeking process and the effective administration of justice, but also the public's interest in protecting court-ordered conduct." *Id.* at 888. This factor weighs heavily in plaintiff's favor. Furthermore, although the City holds an interest in the efficient administration of its parks and recreation facilities, the apparently neutral content of plaintiff's testimony could not reasonably disrupt the City's public services. Thus, plaintiff's deposition testimony constitutes protected speech under the first prong of the First Amendment retaliation analysis.

### 2. Substantial or Motivating Factor

Plaintiff must also show that his constitutionally protected speech was a "substantial" or "motivating factor" in the relevant retaliatory decision.[9] *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568. Viewing all reasonable inferences in favor of plaintiff, the court finds that plaintiff failed to create a genuine issue of material fact as to whether his deposition testimony was a substantial or motivating factor for the alleged harassment he suffered at the hands of defendants. Plaintiff himself testified on numerous occasions that Mr. Williams' and Mr. McCrea's harassment began well before the 1999 deposition testimony. In fact, most of the retaliatory actions alleged by plaintiff occurred **prior to the 1999 deposition**. For instance, plaintiff's negligence in filing timely monthly reports and informing his supervisors of his absences from work **prior to 1999** resulted in Mr. Williams gradually lessening plaintiff's responsibilities and monitoring plaintiff more closely. Thus, the court finds that a reasonable jury could not conclude that plaintiff's 1999 de-

---

9. Plaintiff alleges that defendants committed the following retaliatory acts: (1) usurping his supervisory responsibilities; (2) instructing subordinate employees to spy on him; (3) changing the locks and boxing up his belongings when he was on medical leave; and (4) imposing unique reporting requirements on him. (D.I. 1 at ¶ 16) Except for changing the locks and boxing plaintiff's belongings (which occurred after plaintiff went on medical leave), the court finds that plaintiff's allegations of harassment constitute adverse actions sufficient for retaliation. *See, e.g., Kadetsky v. Egg Harbor Township Bd. of Educ.,* 82 F.Supp.2d 327, 337 (D.N.J.2000) ("While it is true that the majority of cases involving First Amendment retaliation involve an actual discharge, transfer, demotion or like action, the case law indicates that 'retaliatory harassment could, under certain circumstances, constitute an "adverse employment action" which is actionable under the rubric of a First Amendment cause of action.' ") (citations and quotations omitted).

position testimony was a substantial or motivating cause of plaintiff's alleged retaliatory harassment.[10]

### 3. Retaliation Would Have Occurred in Absence of Protected Speech

■■■ Furthermore, even if plaintiff could establish a *prima facie* case of retaliation, the record reflects that the harassment of plaintiff would have continued even in the absence of the protected speech.

> [I]f a plaintiff establishes that the exercise of his First Amendment rights played some substantial role in the relevant decision, he is entitled to the extent practicable to be put in the same position that he would have been in had he not engaged in that protected conduct. As a result, if the defendant is able to show by a preponderance of evidence that the same decision would have been made had the protected conduct not played a substantial role, no relief will be required. On the other hand, if the protected conduct played a substantial role and the defendant is unable to carry its burden of showing the plaintiff has suffered no adverse consequences as a result, the plaintiff is entitled to be put in the same position he would have been in had the tainted decision been made in his favor.

*Suppan v. Dadonna,* 203 F.3d 228, 236 (3d Cir.2000).

■■■ The factual record, read in the light most favorable to plaintiff, demonstrates a course of conduct that commenced before and continued after the deposition. Plaintiff admits that he believed Mr. Williams always "had it in" for him. There is no evidence of record to indicate that Mr. Williams would have ceased his harassment against plaintiff but for the 1999 deposition testimony. Thus, even if plaintiff establishes that his deposition testimony was a substantial or motivating factor in defendants' harassment of him, the record reflects that the harassment would have continued even in the absence of the deposition.

### C. Sections 1985 and 1986 Claims

■■■ Plaintiff also claims that defendants conspired against him in retaliation for the exercise of his First Amendment rights in violation of 42 U.S.C. §§ 1985 and 1986. Section 1985 provides:

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having attended or testified....

42 U.S.C. § 1985(2). Thus, the elements of a claim under § 1985(2) are: (1) a conspiracy between two or more persons[11] (2) to deter a witness by force, intimidation, or threat from attending federal court or testifying freely in a matter there pending, which (3) causes injury to the claimant. *See Dooley v. City of Phila.,* 153 F.Supp.2d 628, 660 (E.D.Pa.2001). Section 1986 provides:

---

**10.** The court acknowledges the testimony of plaintiff and other employees that the alleged harassment "worsened" after plaintiff's deposition testimony. However, upon review of the record as a whole, the court finds that the alleged harassment that ultimately resulted in plaintiff taking medical leave was part of a continuing atmosphere of hostility that was not motivated by plaintiff's 1999 deposition testimony.

**11.** A conspiracy involves a "combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events in order to deprive plaintiff of a federally protected right." *Fioriglio v. City of At-*

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent ... the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured.

42 U.S.C. § 1986. Therefore, to adequately establish a violation of § 1986, a plaintiff must, *inter alia*, show the existence of a § 1985 conspiracy. *See Clark v. Clabaugh*, 20 F.3d 1290, 1295 n. 5 (3d Cir.1994).

█ In the case at bar, the court finds no evidence of record suggesting a conspiracy by defendants to intimidate or deter plaintiff from testifying in the *Brown* litigation. Also, for the reasons stated above, the court finds that plaintiff failed to create a genuine issue of material fact as to whether defendants retaliated against him because of his 1999 deposition testimony. Thus, the court shall grant summary judgment in favor of defendants on plaintiff's §§ 1985 and 1986 claims.

### D. State Law Claims

Because the court shall grant summary judgment in favor of defendants on all of plaintiff's federal claims, the court declines to extend pendent jurisdiction over plaintiff's state law claims. The court, therefore, dismisses plaintiff's common law conspiracy and intentional infliction of emotional distress claims without prejudice, and denies defendant Williams' motion to amend to add a cross-claim under § 2–178 of the Wilmington City Code.

### V. CONCLUSION

For the reasons stated, the court shall grant defendants' motions for summary judgment. An appropriate order shall issue.

### ORDER

At Wilmington this 29th day of May, 2002, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that:

1. Defendants' motions for summary judgment (D.I.105, 111, 119) are granted.

2. Plaintiff's motion to compel production of documents (D.I.115) and defendant Gregory Williams' motion to amend the pleadings (D.I.95) are denied.

3. All other pending motions are denied as moot.

4. The Clerk of Court is directed to enter judgment in favor of defendants and against plaintiff.

█

*lantic City,* 996 F.Supp. 379, 385 (D.N.J.1998) (citing *Darr v. Wolfe,* 767 F.2d 79, 80 (3d Cir.1985); *Ammlung v. City of Chester,* 494 F.2d 811, 814 (3d Cir.1974)).